180 So.2d 527

**DARK'S DAIRY et al.**

**v.**

**ALABAMA STATE MILK CONTROL BOARD et al.**

**BARBER PURE MILK COMPANY OF MONTGOMERY, INC.**

**v.**

**ALABAMA STATE MILK CONTROL BOARD et al.**

**3 Div. 159, 160.**

Supreme Court of Alabama.

Nov. 18, 1965.

Sol Brinsfield, Jr., Montgomery, for Dark's Dairy and others, and Macbeth Wagnon, Jr., and Bradley, Arant, Rose & White, Birmingham, for Barber Pure Milk Co.

Louis Greene and Rushton, Stakely & Johnston, Montgomery, for appellees.

HARWOOD, Justice.

Pursuant to the authority granted it by Sections 205–231, Title 22, Code of Alabama 1940, the Alabama Milk Control Board, after due notice, conducted hearings in Guntersville, Birmingham, Mobile, and Montgomery, looking toward the classification or reclassification of milk and the

prices to be paid by the distributor to the producer, and in turn the price to be charged by the distributor in the sale thereof.

During these hearings the Board received evidence from various segments of the milk industry, i. e., the producers, producer-distributors, and distributors, as well as the consuming public.

After completion of the hearings, the Board convened in executive session and in October 1964, promulgated three orders, namely 1–63, 2–63, and 3–63.

Order 1–63 moved fortified skim milk, skim milk with added solids, and plain skim milk, to Class I from Class II. It also provided that 92% of the sales of chocolate milk would be considered as Class I, where before 100% of the sales of chocolate milk were placed in Class I.

Order 1–63 further provided that items theretofore designated as Class II would remain the same except as to the categories reclassified as above mentioned.

Order 2–63 deals with the price of milk to be paid by the distributor to the producer, and establishes the maximum and minimum resale prices to be charged by the distributor at retail and wholesale.

The price to be paid to the producer by the distributor for Class I milk was continued at $6.56 per cwt.

Feeling aggrieved at the three orders above mentioned as promulgated by the Milk Board, Dark's Dairy, et al. (some seventeen distributors) petitioned the Circuit Court of Montgomery County for a writ of certiorari to review the reasonableness, and constitutionality of Order 1–63 and the provisions of paragraphs 1 through 7 of Order 2–63.

On the same day Barber Pure Milk Company of Montgomery, Inc., filed its petition for certiorari challenging Order 3–63 and certain provisions of Orders 1–63 and 2–63.

The Circuit Court issued the writ of certiorari, and provided that those parts of Orders 1–63 and 2–63 which directly raised the prices distributors were to pay producers for milk, be suspended.

Thereafter some ten producers were granted permission to intervene; and on application of the intervenors, the suspension order was set aside. Also, Barber was given leave to participate in an arrangement made in the Dark's Dairy companion case by which funds accruing to producers under the challenged portions of the orders were to be deposited with the Executive Secretary of the Milk Board to be held by him in escrow subject to further orders of the Circuit Court.

After hearing and argument, the Circuit Court entered a decree by which:

1. Order 1–63 was affirmed in its entirety.

2. Affirmed Order 2–63 except as to paragraph 8 thereof, which was stricken.

(We note that none of the parties have questioned the court's action in striking said paragraph 8, and we pretermit consideration of the court's action in this premise.)

3. Reversed Order 3–63 and remanded the same to the Milk Board.

The court also decreed that the escrow fund held by the Executive Secretary of the Milk Board be terminated and dissolved and the Executive Secretary was ordered to distribute said escrow monies to each producer in the proportionate share to which each producer was entitled.

All parts of Orders 1–63 and 2–63 affirmed by the Circuit Court have been in force since the date of the court's decree.

All of the appellants contended in the lower court, and in this court, that the orders issued by the Milk Board are invalid because no finding of fact was made by the Board showing the basis for such orders.

Admittedly, a respectable number of courts hold to the effect that findings of fact are necessary to support orders of an administrative body. This would appear to be the more practicable course in that the work of a court reviewing the orders of an administrative body would certainly be fa-

cilitated and lessened by a finding of facts by such body, rather than the court having to examine the voluminous records resulting from the often lengthy hearings before the administrative body. The present case might well be cited as an example in this respect, in that the record is over 1000 pages.

However, the doctrine of our cases is to the contrary. As stated in Alabama Public Service Commission et al. v. Nunis, 252 Ala. 30, 39 So.2d 409:

"But if the statute does not require a finding by the commission either in terms or effect, an express finding has been said not to be necessary. Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138; 42 Am.Jur. 426, section 96. In our case of Railroad Commission v. Ala. Gr. So. R. R. [Co.] [185 Ala. 354, 64 So. 13, L.R.A.1915D, 98], supra, the statute did not require a finding to support action by the commission, but directed action when the necessities of the case in the judgment of the commission demanded it. All the commission had to do, it was said, was to inform itself as to the necessities, which was presumed to have been done from making the order. It has been settled by our cases that all legal intendments are with such orders, and will be upheld unless their invalidity is shown. Hawkins v. Vines, 249 Ala. 165, 30 So.2d 451."

To the same effect see also Alabama Public Service Commission v. Higginbotham, 256 Ala. 621, 56 So.2d 401; Alabama Electric Cooperative, Inc. v. Alabama Power Co., et al., 274 Ala. 332, 148 So.2d 613.

Among other things, Section 223, Title 22, Code of Alabama 1940, as amended, provides that the Milk Board, after conducting public hearings and taking evidence may "at its discretion, take the evidence, the matters submitted to it under advisement and deliberate among itself in private and render a decision at a future date. * * *

"After holding such meetings and making such other investigation as the milk control board may deem advisable, the milk control board may fix by official order * * *."

There is nothing in the statutes relating to the functioning of the Milk Board requiring that the Board make findings of fact in support of its orders.

Section 226, Title 22, Code of Alabama 1940, provides that the Circuit Court on certiorari will determine whether orders of the Milk Board are unlawful or unreasonable. The right of appeal to this court of the judgment or decree in such certiorari proceedings is by virtue of Section 90, Title 48, Code of Alabama 1940. We must review the judgment of the Circuit Court without any presumption of its correctness, since no evidence was taken before that court which was in no better position to review the orders of the Board than are we. We will review the orders as though the review had been primarily to this court. Alabama Public Service Commission v. Higginbotham, 256 Ala. 621, 56 So.2d 401.

Since there is no finding of facts, we must consider the evidence in the light most favorable to upholding the orders of the Milk Board and without weighing conflicting evidence. We accept as true those tendencies of the evidence and reasonable inferences to be drawn therefrom which tend to support the action taken by the Board. Alabama Electric Cooperative, Inc. v. Alabama Power Co., 274 Ala. 332, 148 So.2d 613.

Dark's Dairy contends that Orders 1–63 and 2–63 deny the appellants a "reasonable return and profit upon labor and necessary investment" as provided in Sections 205 and 223 of Title 22, Code of Alabama 1940, and as a result hampers and discourages the intelligent production and orderly marketing of milk as to fail to insure a sufficient quality of wholesome milk to the inhabitants of Alabama, all of which is contrary to the public interest and contrary to the spirit and policy of the statutes regulating the production and marketing of milk.

Dark's Dairy further contends that there is a lack of evidence to support any of Or-

**698**

der 1–63, and of paragraphs 1–7 of Order 2–63; that the overwhelming weight of the evidence shows that the effect of said orders in reclassifying certain items into Class I, and raising the price the distributor is to pay for certain classes of milk, without a comparable raise in the amount the distributor may charge for such items, amounts to such a reduction in its "operating spread" as to deny to the distributor a reasonable profit as guaranteed to the distributors by our Milk Board Act; that as a result Orders 1–63 and 2–63 operate in such a manner as to be confiscatory, oppressive, and illegal, and violative of appellant's rights guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution, and Sections 6 and 13 of the Constitution of Alabama of 1901.

In addition to the above contentions, Barber's Pure Milk Company asserts that there is no legal evidence to support the increases in the prices to be paid the producers by the distributors or that such increases are needed to give the producers the return and profit specified in the Act; and that the evidence introduced by the producers in support of their request for higher prices is demonstrably erroneous.

It should be noted that all pricing schedules are on the basis of milk containing 4% butterfat. If the butterfat is below 4% the price paid the producer is reduced five cents for each tenth of a point below 4%, and if the butterfat is in excess of 4%, the price is increased five cents for each tenth of a point excess of butterfat.

The "take-home" pay which a producer receives for the milk he sells a distributor is calculated by the "blend price" or "average price" of all the milk the producer has sold in a given period. The "blend price" is figured in units of 100 pounds, or cwt. Thus under the previous pricing orders the milk for which he is due Class I price or $6.56 per cwt., and the milk for which he receives Class II price, or $4.00 per cwt., and the amount of milk for which he receives Class III or surplus price, or $3.12 to $3.14 per cwt., and the amount of milk for which he is to receive the government

contract price are added together, and the resulting total is divided by 100 to ascertain the "blend price" paid to the producer.

What is termed the "spread" in the milk business is the difference between the cost of the milk to the distributor and the price he receives from the consuming public in the resale of the milk or milk products. Out of this spread the distributor pays the costs of processing, distributing, and marketing the milk or milk products, and all other costs inherent in operating his distributing business such as taxes, licenses, etc. The remainder after such costs of operation, if any, constitutes the profit or loss of the distributor.

At the hearings below numerous individual producers, and representatives of producer organizations appeared as witnesses. The evidence thus produced tended to show that the Alabama dairy farmer (producer) has been faced with continuously increasing costs of production resulting from the increase in prices they must pay for feed, farm machinery, building materials, etc. In recent years it has also been necessary for producers to install bulk tanks at a cost of around $5,000, on which the depreciation is rapid with virtually no resale value.

The evidence also tended to show that over the five years immediately preceding the hearings the average blend price received by the producer had fallen from $5.87 in 1958 to $5.64 in 1962 per cwt.

Most of the producers testified that under present prices and classifications not only were they realizing virtually no profit, they were actually suffering losses in their milk production operations.

■ We think there was ample legal evidence from which the Board could reasonably conclude that the producers of milk in Alabama were in need of price increases for their product.

The Board granted this relief in Orders 1–63 and 2–63 by reclassification, and by increasing the prices to be paid by the distributor. No general concommitant in-

crease was granted the distributors in the prices they could receive in selling their products. The Board by its orders apparently concluded that the "spread" enjoyed by the distributors was sufficient, even with the reclassification and increase in prices to be paid the producers, to permit the distributors to yet earn a "reasonable return and profit upon labor and necessary investment" as provided in Section 223, supra.

At the hearings below evidence was introduced by the distributors tending to show that their profits from these operations were meagre, and that the new orders would probably result in losses to them in operating their businesses.

Section 223, supra, in setting forth the factors that may be considered by the Board, after hearings, in determining the classification and prices of milk, provides among other things that the Board may consider "matters ascertained by it, affecting conditions as they relate to milk in other states."

One of the witnesses presented by the distributors was Mr. James E. Clayton, of the Edward B. McClain Company of Memphis, Tennessee. Since 1955, Mr. Clayton has worked in cost accounting for dairy plants throughout the United States. His firm has been retained as a price and cost consultant by the Milk Industry Foundation, the International Association of Ice Cream Manufacturers, the Louisiana Milk Commission, the Florida Milk Commission, and the Dairy Division, State of Wisconsin. Mr. Clayton had also surveyed several distributing plants in Alabama as recent as six months before the hearings by the Milk Board.

The results of a recent survey in Louisiana participated in by Mr. Clayton were presented at the hearings, along with orders of the Louisiana Milk Commission promulgated as a result of the survey and based in part thereon. Mr. Clayton testified that the milk processing and delivery costs in Louisiana were comparable to such costs in Alabama, that "they would be about the same."

His further testimony was to the effect that items which were Class I and Class II in Alabama under the prior 1961 orders of the Alabama Milk Board were all classified as Class I in Louisiana.

The record shows that the established Class I price in Louisiana at the time of the hearings below was $6.34 per cwt. The Alabama price, as before stated, is $6.56 per cwt., for Class I milk. It is obvious therefore that the Alabama producer was receiving from his distributor some 22¢ per cwt., more for his milk than was his counterpart in Louisiana at the time of the hearings for Class I milk sales.

However, the Alabama producer was receiving a price of $4.00 per cwt., for his milk utilized in Class II sales, which items in Louisiana would be in a Class I category.

The survey in Louisiana revealed that a half gallon of milk in a paper carton was being sold at a wholesale price of 42½¢, which price resulted in a loss of 6¢ per cwt., to the distributor. A cost analysis prepared for the Louisiana Milk Commission by Mr. Clayton's firm showed that if maintaining the producer's price at $6.34 per cwt., an increase to the distributor of 48½¢ a half gallon sales should result in a profit of 41¢ per cwt., and an increase to 49½¢ should result in a profit of 48¢ per cwt., to the distributor.

The national average profit of distributors was shown to be between 40 and 42¢ per cwt.

Following the survey by Mr. Clayton's firm, the Louisiana Milk Commission raised the wholesale price of a half gallon of milk in a paper carton to 48¢.

Under the prior 1961 order of the Board, and under Order 2–63, the established wholesale price of a half gallon carton of homogenized milk in Alabama is 49½¢, and 47½¢ for cream line milk. In addition the distributor can raise these prices to 50½¢, and 48½¢ respectively by exercising the permissive differential permitted under the Board's orders.

The evidence tends to show that in 1962 the Alabama producer's milk was utilized

approximately 69% in Class I, 12% in Class II, and the remainder as sales to government agencies, or as surplus.

The Alabama producer, assuming a 4% butterfat content, was therefore paid a Class I price or $6.56 per cwt., for 69% of his milk, and a Class II price or $4.00 per cwt., for 12% of his milk, and surplus or government sales prices for the remainder.

Order 1–63 reclassified three of five products from Class II to Class I. Chocolate or flavored milk, and non-fat or cultured buttermilk were, however, continued as Class II products. The effect of Order 1–63 was to place in Class I products similar to Louisiana's Class I, except as to chocolate or flavored milk, and non-fat or cultured buttermilk which were retained in Class II, a lower classification than in Louisiana.

Order 2–63 increased the price to the distributor of Class II milk from $4.00 to $4.75 per cwt.

■ While it would appear that the Alabama Class I price is higher than that received by his Louisiana counterpart, it must be remembered that the actual take home pay received by the Alabama producer will be diminished by the "blend" price, and his pay for the Class I milk will be diminished by the much lower price he receives for his Class II milk, while no such decrease afflicts the Louisiana producer since all his milk, for the same utilization, will be paid for as Class I. Analysis of the figures submitted would appear to justify the Board in concluding that the raw product cost to the distributors would be substantially the same in Alabama and Louisiana.

■ The next question is, does the pricing structure of Order 2–63 allow a distributor an adequate return from his consumer sales to cover the costs of buying, processing, and delivering, milk and yet enable him to earn a reasonable profit?

Evidence was presented to the effect that the Alabama producer should realize under the new orders from ½ to 3½¢ more profit per unit from wholesale sales on most milk products than will a Louisiana producer, while on direct sales to consumers (home deliveries) his return will be ½ to 2¢ lower than the Louisiana distributor would realize. However, the evidence tends to show that about 70% of sales by distributors is wholesale.

■ As before noted, the price of government agency sales was increased by Order 1–63 from $4.15 to $4.75 per cwt. The distributors contend that this increase will destroy their competitive position in relation to surrounding states.

However, at the hearings below evidence was presented to the effect that for government milk the minimum price per cwt., paid the producer is $4.80 in Georgia, $5.01 in Florida, $5.84 in Louisiana, while three prices are in effect in Mississippi, i. e., $5.42, $5.58, and $5.68. There was also evidence that the Alabama price is based on 4% butterfat content, and the distributor is required to deliver to government agencies milk with a butterfat content of only 3.25%. Such evidence amply supports the reasonableness of the new pricing orders for government agency milk as fixed by the Board.

### Classification of Non-Fat or Cultured Buttermilk on Basis of Usage, rather than Sales

■ Paragraph 7 of Barber's petition complains of that part of Order 1–63 which classifies fat or non-cultured buttermilk on the basis of sales rather than on the basis of usage by the distributor.

Under the above mentioned portions of Order 1–63 distributors are required to pay producers at the rate fixed for Class II milk, on the basis of 99% of their total sales of such buttermilk, even though such buttermilk sales include a reconstituted buttermilk manufactured largely from dry skim milk powder and lactic acid, products which the producer does not supply.

The evidence shows that there are periods when the supply of fresh whole milk

is insufficient to supply the needs of the distributor for all types of products. It is then necessary for the distributor to fill his needs for non-fat or cultured buttermilk by manufacturing such products from milk powder and other materials not supplied by the producer.

On days when a surplus of milk is delivered to a distributor by a producer, the producers are thereby building up their total deliveries to the distributor which, at the end of the pay period, must be paid for according to *sales* in a particular classification. Thus the Class II price for milk not used in that category, but calculated on a basis of 99% sales of buttermilk including that manufactured and reconstituted from products not sold to the distributor by the producer. Thus the producer is being paid a Class II price for milk, or a part thereof, which is surplus milk. Such result is unreasonable.

Counsel for the producers argue in support of that portion of Order 1–63 now being considered, that unless the classification of non-fat buttermilk is on the 99% sales basis, a distributor could by reconstituting buttermilk from milk powder and other ingredients diminish his needs for fresh milk for buttermilk purposes, and thereby increase the amount of surplus milk with a resulting decrease in the blend price paid the producer.

The record is devoid of evidence tending to show what percentage of non-fat or cultured buttermilk is manufactured from fresh milk or what percentage is reconstituted from milk powder and other elements. Without such evidence it must appear that the classification of non-fat buttermilk on the basis of the sales of 99% of all buttermilk, that is that made from fresh milk and that made from powder, etc., can only be deemed as arbitrary. It cannot be determined from the record why the figure was set at 99% of sales, rather than 95%, or 80%, etc.

The argument forwarded by the distributors is valid, in that as presently operative Order 1–63 does in fact place them in a situation where they well could be compelled to pay for milk on a Class II basis when such milk was not used in making buttermilk, and should be paid for on a Class III or surplus basis. Such result is beyond the power of the Board.

The contention of the producers as to the possibility of a distributor using powder to reconstitute buttermilk, and thus throw fresh milk into Class III, when the distributor by using fresh milk would have to pay the higher Class II price for such utilization could well be met by a requirement that a distributor must use fresh milk in its buttermilk sales when fresh milk is available.

It is our conclusion therefore that that portion of Order 1–63 providing that 99% of sales of non-fat or cultured buttermilk shall be classified as Class II milk is unreasonable and arbitrary, and must be set aside.

*Order 3–63*

As before stated, the lower court set aside Order 3–63 in its entirety on the ground that no evidence was presented in the hearings below to support such order.

Basically there are three current methods by which a producer can build or acquire "quota" with a distributor to whom he sells milk.

1. The "plant usage system" which is in operation in a majority of distributing plants. Under this method the quota for each producer is established by taking the ratio of a single producer's milk to the total amount of milk purchased by the distributor from all producers during the base building period, (September 1 to February 28), and applying such ratio for the next twelve months to the total sales of fluid milk for human consumption (called Class I sales).

As an illustration, assume that a distributor purchases 100,000 pounds of milk from all of its producers during a base building period, and that Producer A had supplied 10,000 pounds. He would thereby gain a quota of 10% of the sales by the distributor. For the next year, commencing 1 March through 28 February, (base build-

**702**

ing period), he would be paid a base price (Class I) for 10% of the Class I sales by the distributor. Should he furnish the distributor 15,000 pounds of milk in such following year, he would receive a Class I price for 10,000 pounds; a Class II price for 10% of the Class II sales by the distributor, whatever amount the Class II sales might be; for any remaining milk he would be paid a Class III, or surplus milk price, first giving credit for government sales or interplant sales, if any.

2. The "winter production" system which is determined by the "summer production." Since this system is not utilized by any of the distributors involved in these proceedings, we are happy to leave the same to fry in its own complications.

3. The "alternate quota" plan previously existing was changed in three aspects by Order 3–63, otherwise the previously "alternate quota" plan was unchanged. It is these changes wrought by Order 1–63 which are now to be considered.

The changes made by Order 3–63 are:

(a) Permitting the "alternate quota" plan to remain in effect when adopted by 65% of the licensed producers at a plant holding at least 65% of the total quota at the plant, and to remain in effect until rescinded by the same vote. Previously the "alternate quota" plan had to be established by the producers each year.

(b) Under prior regulations where the "alternate quota" plan was in effect, the distributor and a new producer could petition the Milk Board to permit the new producers to earn a quota after notice to all affected parties, and a hearing. The Board could then authorize the new producer to build a quota on such terms as the Board felt justified. Under Order 3–63 the Board, under similar conditions can allow a new producer to earn quota if it deems it necessary, and *"if there is an insufficiency of Class I milk available to the petitioning distributor from its producers."* (Emphasis ours.)

(c) The quantity of producer's milk delivered during the base building period used in calculating quota will not be more than 110% of his share of Class I and Class II sales during the base building period. Previously the figure had been 115%.

If Order 3–63 is to be sustained, such result must be on the basis of the testimony of Mr. Goodwin Myrick, a milk producer who is chairman of the Dairy Committee of the Alabama Farm Bureau. During his testimony Mr. Myrick submitted a written memorandum of his suggestions in support of his testimony.

As to the adoption of an alternate quota plan it was Mr. Myrick's recommendation and testimony that such plan be put in effect at a distributor's plant by a vote of *51% of the licensed producers at such plant* and that such plan remain in effect until voted out by 51% of the licensee producers at the plant.

That portion of Order 3–63 relating to this phase provided that an alternate quota plan could be put in effect "when 65% of the licensed producers *holding at least 65% of total quota of a plant* vote in favor of" such plan, and that such plan shall remain in effect until it is voted out on the same basis.

■ We find no evidence supporting the aspect of Order 3–63 now being considered. Mr. Myrick's recommended plan is so entirely different from the order as promulgated that it cannot be rationally concluded that it finds support in Myrick's testimony. Otherwise there is no evidence, and we are in accord with the lower court's conclusion that that part of Order 3–63 relating to adoption of an alternate quota plan is void of supporting evidence and must be stricken.

■ Again, we are in accord with the lower court's conclusion that that portion of Order 3–63 mentioned in paragraph (b), supra, which added to the previous existing order the provision "if there is an insufficiency of Class I milk available to the petitioning distributor from its producers" is invalid insofar as the additional provision

is concerned. The matter set forth in the provision was at no time alluded to in the entire hearings, nor was there an iota of evidence to support this added provision. The Board therefore exceeded its power in adding this provision in the absence of any evidence in support thereof.

■ We are in disagreement with the lower court's conclusion that the evidence is insufficient to sustain that portion of Order 3–63 reducing to 110% from 115% a producer's share of Class I and Class II sales during a base building period in calculating quotas. This change was set forth in paragraph (c), supra.

In support of this change Mr. Myrick testified that the change to 110% would tend, at least to the extent of 5%, to lessen the necessity of over production of milk by a producer in order to keep pace with other producers who were also over producing, with the resulting increase in surplus milk. Also, in event of extreme hardship suffered by a producer during a base building period, such as decrease in his herd, destruction of barns by fire, etc., the quota already acquired would be more effectively protected.

This testimony would, in our opinion, authorize the 5% change as above set forth under the broad general powers of the Board granted in Section 223 of Title 22, Code of Alabama 1940.

It is our conclusion therefore that sufficient evidence was before the Board to sustain that portion of Order 3–63 as set forth in paragraph (c), supra. It follows that the decree of the court below is due to be reversed in this aspect.

Counsel for appellant Barber also argues that the notice of the hearings published by the Board was insufficient to inform the distributor appellants that among the things to be considered was the amount of the distributor's "spread" and therefore the orders resulting in a reduction of their "spread" were arbitrary and a denial of due process of law.

■ The right to a hearing of course embraces not only a right to present evidence, but also a reasonable notice of claims to be considered at the hearing. Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129.

■ The notice published by the Board advised all interested parties of the scheduled hearings to "consider any and all matters and things affecting the production, transportation, processing, storage, distribution, pricing, and consumption of fluid milk and milk by-products within the aforesaid areas."

The appellant distributors, including Barber, did appear at the hearings. They offered voluminous evidence showing the effect of price changes upon their "spread." It is clear from the evidence offered by the distributors that they were fully aware that modification of the pricing structures might adversely affect their "spread" and they contested this point to the fullest in the hearings. The notices were sufficient to sustain the matters considered by the Board, and the contention that the notices were insufficient in this regard is without merit.

It is our conclusion therefore that the decree of the lower court affirming Order 1–63 in its entirety is to be affirmed except as to that portion of Order 1–63 requiring the distributor to pay for Class II milk sold as non-fat or cultured buttermilk on the basis of 99% sales of such product. Our views and reasons have been set out above as to the arbitrariness of this portion of Order 1–63, that is, the distributor under such pricing scheme is compelled to pay Class II prices on milk even though the buttermilk may have been manufactured from milk powder and other ingredients over which the Board has no pricing authority.

That portion of the court's decree affirming Order 2–63, except as to paragraph 8 thereof, which was stricken, is affirmed by this court.

That part of the lower court's decree reversing and remanding to the Alabama Milk Board Order 3–63 is affirmed, except as to that portion providing that the quan-

tity of producer's milk delivered during the base building period used in calculating quota will be not more than 110% of his share of Class I and Class II sales during the base building period. As to this portion of Order 3–63, we conclude that there was sufficient evidence before the Board to sustain the order in this aspect. Accordingly, the decree of the lower court is reversed insofar as it invalidated Order 3–63 in the aspect above discussed.

The decree of the trial court is affirmed in part, reversed in part, and remanded to that court with instructions to enter a decree modifying its former decree so as to conform with this opinion.

Affirmed in part, reversed in part, and remanded with instructions.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.