PER CURIAM.
This appeal involves an order of the Alabama Dairy Commission which permits producers to share in the profits of sales of buttermilk made from milk powder.
Succinctly stated, Order 2-76 required that if a distributor receives surplus milk from the farmer, the distributor can use it in making buttermilk or not as he sees fit, but if he sells milk made from powder, he must pay for an equivalent portion of the farmer’s surplus milk as though such surplus milk had been used to make the buttermilk, that is, at the Class I price.
In order to compensate the distributor, in part, for this increased cost of manufacturing buttermilk from powder, the Commission increased the wholesale price of buttermilk, whether made from powder or fresh skim milk. In other words, the Commission continues to regulate the price of buttermilk whether made from powder or fresh skim milk. An example of how the Commission order would work is, as follows: Assume that during the month of June, a farmer ships 1,000 pounds of milk to a distributor. At the end of the month, the farmer’s pro rata share of the distributor’s sales are as follows: 600 pounds of the farmer’s milk was used to make homogen *279 ized milk (Class I) and 400 pounds was used to make yogurt, or was resold to a cheese manufacturer (Class II). The distributor’s records also show that it sold 300 pounds of buttermilk made from powdered milk. Under the old pricing structure, the farmers would have received the Class I price for 600 pounds of milk, and the Class II price for 400 pounds of milk. The distributor would have paid the farmer nothing from its buttermilk sales, and would have realized the entire profit, which the record before the Commission shows was considerable because the raw product cost of powder was unregulated but the sales price of buttermilk made from powder was regulated. Under the new regulation, the farmer gets to share in this profit. He would be paid for 900 pounds of milk at the Class I price, and 100 pounds of milk at the Class II price. The extra cost to the distributor is the difference between the Class I and Class II prices. In order to compensate the distributor for this increased cost, the Commission increased the wholesale price which he may charge the retailer.
Under the order, the farmer gets the Class I price for the distributor’s buttermilk sales only if the farmer at some point ships an equivalent amount of milk. The regulation does have a “carryover” provision, strenuously objected to by the distributors, which operates as follows: If a farmer has not shipped “surplus” milk equal to his share of the plant’s sales of buttermilk made from powder, he does not get paid for such share. However, he gets a “credit” which may be carried forward to succeeding months. If the farmer later ships “surplus” milk to the plant equal to his credited share of earlier sales of buttermilk made from powder, he gets the Class I price for this milk. The farmer never gets paid for milk he does not deliver, but under the “carryover” provisions, it is possible for a distributor’s buttermilk sales to give rise to a Class I price for “surplus” milk which was not delivered until after the month in which the buttermilk sales occurred.
Distributors, unhappy with Order 2-76, asked the Circuit Court of Montgomery County to review it. That court, citing this Court’s case of Dark’s Dairy v. Alabama State Milk Control Board, 278 Ala. 693, 180 So.2d 527 (1965), held it to be invalid, as being beyond the powers of the Commission. The Commission appealed. We reverse.
At first blush, it would seem that Dark’s Dairy would control this case because Dark’s Dairy, too, involved a classification and pricing order of the old Milk Board involving sales of buttermilk made from powder. However, it is apparent from a close reading of Dark’s Dairy that this Court did not hold in that case that a milk regulatory Commission was powerless, under all fact situations, to classify and regulate the price of buttermilk made from powder.
In Dark’s Dairy, the producers argued essentially what the Commission argues here, namely:
“Counsel for the producers argue in support of that portion of Order 1-63 now being considered, that unless the classification of non-fat buttermilk is on the 99% sales basis, a distributor could by reconstituting buttermilk from milk powder and other ingredients diminish his needs for fresh milk for buttermilk purposes, and thereby increase the amount of surplus milk with a resulting decrease in the blend price paid the'producer.”
This Court answered that argument, as follows:
“The record is devoid of evidence tending to show what percentage of non-fat or cultured buttermilk is manufactured from fresh milk or what percentage is reconstituted from milk powder and other elements. Without such evidence it must appear that the classification of non-fat buttermilk on the basis of the sales of 99% of all buttermilk, that is that made from fresh milk and that made from powder, etc., can only be deemed as arbitrary. It cannot be determined from the record why the figure was set at 99% of sales, rather than 95%, or 80%, etc.”
Here, unlike the situation in Dark’s Dairy, there was substantial evidence presented, *280 and based on this evidence, the Dairy Commission made the following findings of fact:
“3. Approximately three-fourths of the buttermilk processed and distributed by licenses of the Commission is made from non-fat milk powder. In the absence of adequate regulations the sales of fluid buttermilk processed from non-fat milk powder are lost to producers.
“4. The cost of producing buttermilk from non-fat milk powder is less than producing buttermilk from fresh Class I skim milk. This cost difference creates the incentive to produce buttermilk from non-fat milk powder.
“5. Some distributors are producing buttermilk from fresh Class I skim milk and some are producing buttermilk from nonfat milk powder, thus creating a disparity of costs among distributor licenses.
“6. Present wholesale and retail prices for buttermilk do not adequately reflect the cost of producing said buttermilk using fresh Class I skim milk.
“7. Wholesale and retail prices for buttermilk can be adjusted to adequately reflect the cost of producing buttermilk from fresh Class I skim milk and give the consuming public an adequate supply of high quality buttermilk at a fair price. “8. The use of fresh Class I skim milk in the production of buttermilk will tend to stimulate more production of milk in Alabama.”
These findings are supported by the record and justify the classification and pricing action taken by the Commission, acting pursuant to the authority granted it by Section 20 of Act No. 408, Acts of Alabama, 1971, p. 1097, [carried as Title 22, § 223(1), Code of Alabama, 1940, Recompiled, 1958, (1973 Cumulative Supplement)], which provides, in part:
“When in the judgment of the dairy commission, it is necessary or advisable, due to seasonable fluctuations or other unstable conditions, in order to promote a proper balance between the supply of and the demand for milk, to fix a lesser minimum price for milk which is produced in excess of what is needed for fluid milk consumption, the dairy commission may establish the quantity of milk for which the distributor or milk dealer shall pay the fluid or base milk price, and may establish a lesser minimum price for milk which is produced in excess of what is needed for fluid milk consumption. For this purpose, the dairy commission may compute said quantity upon a uniform system of plant usage, classifying milk according to its various usage and establishing different minimum prices which the milk dealer or distributor shall pay for each classification, or the dairy commission may, if it deems it most advisable, establish a base surplus system, placing all milk sold by a plant for fluid milk consumption, including all milk as defined in the definition of fluid milk in one classification, establishing a minimum price therefor and all milk processed by such distributor or milk dealer into by-products into another classification, and fixing a lesser minimum price for said surplus milk so used in the byproducts classification, or the dairy commission may use a combination of both systems. The dairy commission shall have authority to use the different systems of classifications in different milk sheds or different localities of the state as it deems most advisable to carry out the provisions of this chapter. The dairy commission shall have the power to establish uniform rules and regulations for the apportionment of this quota of base milk among the various producers who furnish such distributors and milk dealers with their regular milk supply used for such purposes, and may adopt such systems for the apportionment of such base or higher price classification of milk among the several producers as it may determine to be the most just and equitable in the administration of this chapter. For this purpose, the dairy commission may require any milk dealer or distributor to supply necessary information about the quantity of milk received from the producers during a specified period of time, and any other information necessary for the determination of this matter. The *281 dairy commission may determine the minimum price to be received by producers for milk within the quota of base or higher price classification of milk and for surplus milk or milk in excess of such producers quota. Each order fixing minimum price or handling charges may classify milk for forms, classes, grades, or use as the dairy commission may deem advisable and may specify the minimum price in each classification, grade or use as the dairy commission may determine. [Emphasis added.]”
If Order 2-76 is invalidated, it is reasonable to assume that the previous inequitable and inconsistent pricing system for buttermilk would continue under which a distributor would share a regulated wholesále price for buttermilk, whether made from powder or fresh skim milk, but would have an unregulated raw product cost, thereby throwing substantial quantities of fresh skim milk into the Class II price, and consequently injuring the producers. Order 2-76 attempted to remedy this inequity and inconsistency, and also attempted to stimulate milk production in Alabama. We find Order 2-76 is reasonable.
It is not the duty of the courts to devise the scheme for regulating the fluid milk industry. That job belongs to the Alabama Dairy Commission.
Our duty is to review the orders of the Dairy Commission under the rule of review set out in Alabama Jersey Cattle Club v. Alabama State Milk Control Board, 274 Ala. 611, 150 So.2d 711 (1963), as follows:
“* * * (1) Matters for the judicial tribunal are whether the order is unlawful, and what should be the legal conclusion from the facts found. (2) The review by certiorari includes a determination by the circuit court of whether the order is unreasonable based on the facts so found, but not a determination of whether the facts found by the board are true upon a consideration of the evidence. (3) Where there is some evidence on which to base such a finding, this satisfies the rule of review, as contemplated by the statute.”
After reviewing Order 2-76 under the rule enunciated in Alabama Jersey Cattle Club, we are of the opinion that the judgment of the circuit court is due to be reversed.
REVERSED AND REMANDED.
TORBERT, C. J., and MADDOX, AL-MON, SHORES, EMBRY and BEATTY, JJ., concur.
JONES, J., concurs in the result.
BLOODWORTH and FAULKNER, JJ., dissent.