235 So.2d 860

**STATE OIL AND GAS BOARD OF ALABAMA et al.**

**v.**

**SEAMAN PAPER COMPANY.**

**STATE OIL AND GAS BOARD OF ALABAMA et al.**

**v.**

**ANCORA CORPORATION et al.**

**STATE OIL AND GAS BOARD OF ALABAMA et al.**

**v.**

**Cora O. PLEMMONS et al.**

**STATE OIL AND GAS BOARD OF ALABAMA et al.**

**v.**

**SEAMAN PAPER COMPANY.**

**STATE OIL AND GAS BOARD OF ALABAMA et al.**

**v.**

**Cora O. PLEMMONS et al.**

1 Div. 422, 422–A, 422–B, 422–C and 422–D.

Supreme Court of Alabama.

April 16, 1970.

Rehearing Denied June 18, 1970.

A. J. Harris, Asst. Atty. Gen., Dewitt Reams, James D. Brooks, Special Asst. Attys. Gen., Mobile, for appellants.

Kilborn, Darby & Kilborn, and Albert J. Tully, Mobile, for appellees.

Bart B. Chamberlain, Jr., Mobile, amicus curiae.

LAWSON, Justice.

This is an appeal from a decree of the Circuit Court of Mobile County, in Equity, as modified, which set aside and held for nought certain orders of the State Oil and Gas Board, hereinafter referred to as the Board, and which remanded the "proceedings" to the Board.

The record is voluminous, consisting of more than 1500 pages. Much of the evidence is of a highly technical nature. Questions are presented which have not previously been considered by this court.

The statutory provisions which controlled the production of oil in this state, at all times pertinent here, are not included in the 1940 Official Code of Alabama. They can be found in the 1958 Recompiled Code of Alabama in Article 1, Chapter 3, Title 26, §§ 179(24)–179(55) and in Article 4, Chapter 3, Title 26, §§ 179(70)–179(78). The 1958 Code is not an Official Code, but for convenience we will hereinafter cite the appropriate sections of Title 26 of that Code, including the 1967 Cumulative Pocket Part to Volume 7 of that Code, rather than the legislative acts.

The Citronelle Oil Field, in Mobile County, was discovered in 1955. In 1961 a petition was filed with the Board seeking the operation of certain tracts in that field as a unit so as to increase the ultimate recovery of oil by the use of secondary recovery methods and in order to prevent waste and the drilling of unnecessary wells.—§ 179(70).

A tract usually consists of forty acres, "a quarter-quarter section," with not more than one producing well on it.

Primary recovery is obtained when natural forces, such as gas, force the migration of oil to the well bore. When oil can no longer be economically obtained by primary recovery, resort is had to secondary recovery methods, such as the injection of fluids into the oil sands, in order to drive the remaining oil to the well bore.

After a hearing the Board, on April 21, 1961, by its Order No. 166, approved the operation of 139 tracts in the Citronelle Oil Field as a unit. Such action of the Board was apparently grounded on the provisions of § 179(71).

The unit so created was known as the Citronelle Unit. In its Order No. 166 the Board approved a Unitization Agreement and a Unit Operating Agreement. In those Agreements provision was made for the operation of the Citronelle Unit by an Operators Committee, which acts through its Chairman and a Unit Manager.

In Article 10 of the Unitization Agreement provision was made for the "Enlargements of the Unit Area and Field Area."

For aught appearing, the Board's Order No. 166 was not challenged on the ground that it did not comply with the requirements of § 179(72). Nor was it asserted that said Order did not become effective because the requirements of § 179(73) were not met.

By its Order No. 199 the Board, on September 26, 1962, approved an enlargement of the Citronelle Unit whereby 108 wells or tracts were added to the original 139-tract Citronelle Unit. Neither the validity nor effectiveness of Order No. 199 was challenged in so far as we are able to determine. The enlarged unit, containing 247 tracts, although sometimes referred to in the record before us as the Citronelle Unit as first enlarged, will generally be referred to hereinafter as the Citronelle Unit.

Thereafter studies were made by the Board and by the Citronelle Unit to determine the necessity or advisability of further enlarging the Citronelle Unit. As a result of those studies, the Board and the Citronelle Unit concluded that further enlargement of the Citronelle Unit area was necessary to prevent waste, to increase the ultimate recovery of oil, and to avoid the drilling of unnecessary wells.—§ 179(70).

The studies conducted by the Citronelle Unit were completed in 1964. Its Unit Manager immediately recommended to the Chairman of its Operators Committee that certain outside tracts be considered for inclusion in the Citronelle Unit. As a result of this recommendation, the Chairman of the Operators Committee charged the Engineering Subcommittee with the responsibility of evaluating all tracts contiguous to the 247-tract Citronelle Unit for the purpose of determining the advisability of making an effort to have some of them brought into the Citronelle Unit. The Engineering Subcommittee completed its evaluation and presented its report to the Operators Committee in May, 1965.

At the June 3, 1965, meeting of the Operators Committee of the Citronelle Unit it was unanimously resolved that the owners of tracts which conform to the requirements, terms and conditions of the original Unitization Agreement, except the Ancora and Sun Units, be invited to join the Citronelle Unit under the terms of the original Unitization Agreement.

Thereafter, an invitation was issued to the operators of all of the wells on the ninety-four tracts which are contiguous to the Citronelle Unit. An expression of interest was obtained from most, if not all, of those owners.

At a meeting of the Operators of the Citronelle Unit held on July 14, 1965, enlargement of the 247-tract Citronelle Unit by adding the aforementioned ninety-four contiguous tracts was approved. Thereupon, the Operators Committee of the Citronelle Unit instructed the Unit's Manager to file a petition with the Board in conformity with the provisions of § 179 (70) requesting that the Board order that the said ninety-four contiguous tracts be brought into the Citronelle Unit as the second enlargement of the Original Citronelle Unit.

On October 1, 1965, the then Unit Manager of the Citronelle Unit, John E. Stein, filed a petition with the Board on behalf of the Unit requesting that the Unit be further enlarged so as to include the above-mentioned ninety-four contiguous tracts.

At a meeting of the Board held on October 15, 1965, evidence was presented in connection with the Stein petition. At the conclusion of that hearing, the Chairman of the Board stated: "The Board will now take this matter under advisement and we will notify you when we have finished with our deliberation."

Before the Board acted on the Stein petition, the Board had another meeting. It was on December 17, 1965. At the outset of that meeting the Chairman of the Board stated, in effect, that the first item on the agenda was a continuation "of the hearing" on the Stein petition. Counsel for Stein and the Citronelle Unit protested on the ground that the hearing on that petition had been concluded on October 15, 1965. The protest or objection was overruled.

The Honorable Willis C. Darby, Jr., who had represented Ancora Corporation,

a corporation, hereinafter referred to as Ancora, at the October 15, 1965, meeting, was present at the December 17, 1965, meeting. He appeared again on behalf of Ancora. The Honorable Albert J. Tully was present at the December 17, 1965, meeting. He appeared as counsel for Seaman Paper Company, a corporation, hereinafter referred to as Seaman, who owned "the entire royalty interest in Citronelle Unit C–11–10," and apparently on behalf of himself and as counsel for Cora O. Plemmons, Hattie O. Salter, Elizabeth C. Scott and Dennis Porter, who were "the owners of royalty interests in Citronelle Unit A–24–11." "Citronelle Unit C–11–10" and "Citronelle Unit A–24–11" in our opinion should be considered in this opinion as tracts rather than units, although the word "Unit" is not used incorrectly. They are among the ninety-four tracts which the Stein petition sought to bring into the Citronelle Unit.

At the conclusion of the hearing held on December 17, 1965, the Board rendered its Order No. 65–28, whereby the prayer of the Stein petition was granted; that is, by said Order No. 65–28 the aforementioned ninety-four tracts were to be added to the Citronelle Unit in the event certain requirements were met.

Subsequently, Stein filed with the Board a petition requesting, among other things, that the Board " * * * enter an order making Order No. 65–28, dated December 17, 1965, * * * effective and operative as of 7:00 o'clock A.M. April 1, 1966 * * * "

At a meeting held on March 18, 1966, the Board by its Order No. 66–5 made its Order No. 65–28, dated December 17, 1965, effective and operative as of 7:00 A.M. April 1, 1966.

Section 179(38) [Cumulative Pocket Part, *supra*], provided the method by which a court review could be obtained of an order of the Board at the time Orders 65–28 and 66–5 were promulgated. The

provisions of said section pertinent at this point in this opinion read:

"Any interested person aggrieved by any rule, regulation or order made or promulgated by the board hereunder, and who may be dissatisfied therewith, shall within thirty days from the date said order, rule or regulation was promulgated, have the right, regardless of the amount involved, to file a suit in the circuit court in equity of the county in which all or part of the aggrieved person's property affected by any such rule, regulation or order is situated, to test the validity of said rule, regulation or order promulgated by the board. * * "

Five bills were filed in the Circuit Court of Mobile County, in Equity, against the Board and against three individuals as members of the Board. For present purposes, we will consider the Board as being the sole respondent to each of those bills.

Two of those bills were filed on January 12, 1966, one by Seaman and one by Cora O. Plemmons, Hattie O. Salter, Dennis Porter, Elizabeth C. Scott and Albert J. Tully. We will refer to the complainants in the last-mentioned bill simply as Cora O. Plemmons et al. The stating parts of the two bills are in all material respects identical, as are the prayers. They both sought to have the equity court set aside "Orders of the Board made or promulgated on, to-wit, the 15th day of October, 1965, and on, to-wit, the 17th day of December, 1965" or, in the alternative, to remand the "proceedings herein back" to the Board for further proceedings to be conducted in conformity with the equity court's direction.

The other three bills were filed on April 14, 1966. One was filed by Seaman and one was filed by Cora O. Plemmons and the other persons who were her co-complainants in one of the bills filed on January 12, 1966. The last-mentioned bill will be considered as having been filed by Cora O. Plemmons et al. The bill filed by Seaman on April 14, 1966, and that filed by Cora

O. Plemmons et al. on the same date are identical in all material respects with each other and with the bills which those complainants filed on January 12, 1966, except that they prayed that the equity court set aside the Board's Order of March 18, 1966 (No. 66–5) or, in the alternative, to remand the proceedings to the Board for further proceedings to be conducted in conformity with the court's directions. Seaman and Cora O. Plemmons et al. were and are represented by the same attorney, Mr. Tully. Apparently Mr. Tully filed the two bills on April 14, 1966, because, as shown above, the bills filed on behalf of the same complainants on January 12, 1966, attacked "Orders of the Board made or promulgated on, to-wit, the 15th day of October, 1965, and on, to-wit, the 17th day of December, 1965," whereas no order of the Board was rendered on the 15th day of October, 1965, and the Order of December 17, 1965 (65–28) was not finalized until March 18, 1966 (Order 66–5). The third bill filed on April 14, 1966, was filed by Ancora and three limited partnerships. For the purposes of this appeal, we will consider that bill as having been filed only by Ancora. It sought to have the equity court enter an order setting aside, annulling and holding for nought the Orders of the Board numbered 65–28 (December 17, 1965) and 66–5 (March 18, 1966).

The Board filed an answer to Ancora's bill on May 3, 1966, and filed answers to the other bills on May 6, 1966. In each of the answers the Board denied the material averments of the complaint to which the answer was directed.

The trial court on May 6, 1966, ordered that the five cases be tried "simultaneously," which we consider to have been an order of consolidation. Such action is not questioned.

On June 16, 1966, the Board filed a "Record of the Proceedings of the State Oil and Gas Board" in the equity court.— § 179(38).

The Board filed a motion on September 22, 1966, to make complete the record of the proceedings before the Board, which motion was denied.

On October 6, 1966, the trial court rendered a decree applicable to each of the cases, setting aside and holding for nought the Board's Order of December 17, 1966 (65–28) and its Order of March 18, 1966 (66–5). In that decree the "proceedings" were remanded to the Board.

The Board filed a petition for rehearing on November 4, 1966.

On November 25, 1966, the trial court modified its decree of October 6, 1966, by deleting therefrom one paragraph and in lieu thereof adding the following paragraph:

"Upon consideration of the entire record, the Court finds that the orders appealed from were unsupported by the evidence; were not reasonable; did not fulfill and satisfy all of the terms and provisions of the Unitization Agreement relating to the enlargement of the Unit Area; and were not in accordance with law."

In all other material respects the decree of November 25, 1966, rendered in response to the petition for rehearing, is the same as the original decree rendered on October 6, 1966.

The Board appealed to this court from the decree of October 6, 1966, as modified. Citation of appeal was duly served on the complainants in each of the five cases. The certificate of appeal was treated by us as presenting five separate appeals. They were docketed as 1 Div. 422, 1 Div. 422–A, 1 Div. 422–B, 1 Div. 422–C and 1 Div. 422–D.

We subsequently entered the following order:

"IT IS ORDERED, by agreement of the parties, that permission is hereby granted to consolidate the records on appeal in the above styled causes [1 Div.

422, 1 Div. 422–A, 1 Div. 422–B, 1 Div. 422–C, 1 Div. 422–D] and that counsel is hereby permitted to file consolidated briefs."

In accordance with that order, only one record was filed in this court, consisting of three volumes. A fourth volume was filed in response to a writ of certiorari which was issued on an order of this court.

Consolidated briefs were filed on behalf of the Board, the appellant. Consolidated briefs were filed on behalf of the appellee Ancora by its counsel, Mr. Darby, and consolidated briefs were filed on behalf of the appellees Seaman and Cora O. Plemmons et al. by their counsel, Mr. Tully. We may refer to the latter brief simply as the Seaman brief.

Section 179(38) which, as we have observed above, regulates the manner of obtaining a review by a court of equity of a rule, regulation or order of the Board, limits the scope of that review. Said section provides:

"* * * In such trials the validity of any rule, regulation or order made or promulgated hereunder shall be deemed prima facie valid and the court shall be limited in its consideration to a review of the record of the proceedings before the board, and no new or additional evidence shall be received.

"The reviewing court shall limit its consideration to the following:

"A. Whether the rule, regulation or order is constitutional.

"B. Whether the rule, regulation or order was without or in excess of jurisdiction.

"C. Whether the rule, regulation or order was procured by fraud.

"D. Whether the rule, regulation or order is reasonable.

"E. Whether the rule, regulation or order is unsupported by the evidence."

We lay aside as surplusage the conclusions of the trial court that Orders 65–

28 and 66–5 did not fulfill and satisfy all of the terms and provisions of the Unitization Agreement relating to the enlargement of the Unit Area and that said orders were not in accordance with the law. Those are not among the grounds which the trial court is authorized to consider when reviewing a rule, regulation or order of the Board as provided in § 179(38).

The trial court did consider that those orders were unreasonable and were unsupported by the evidence. We think those two conclusions are sufficient to cover the so-called special findings made by the trial court as those findings are interpreted by the parties to this appeal.

The trial court made specific findings. to the effect that the Board did not follow the provisions of § 179(74) in connection with the allocation of oil to each pool and to each tract or to the portion of each pool added to the Unit Area and in determining the relative contribution which each such added pool and tract, or such portion of each pool, would make to future production; nor were the terms and provisions of § 179(74) or those of the Unitization Agreement relating to the enlargement of the Unit Area fulfilled and satisfied.

It may be that the trial court did no more than consider that the Board's findings on which the said orders were based were unreasonable and were unsupported by the evidence in connection with the allocation of oil to pools and tracts and in connection with the formula which was used. But we are not certain that the decree should be so limited and we will consider some of the other reasons why appellees assert that the decree of the trial court should be affirmed. We have said that where a decree correctly determines the equities of a case the reasons upon which the trial court proceeded are unimportant.—Andrews v. Sullivan, 260 Ala. 291, 69 So.2d 870.

Section 179(74), in pertinent part, reads :

"(a) The board, by entry of new or amending orders, may from time to time add to unit operations portions of pools.

not theretofore included, and may add to unit operations new pools or portions thereof, and may extend the unit area as required. Any such order, in providing for allocation of production from the unit pool of the unit area, shall first allocate to such pool or pools or portion thereof so added a portion of the total production of oil or gas, or both, from all pools affected within the unit area, as enlarged, (and not required in the conduct of unit operations or unavoidably lost), such allocation to be based on the relative contribution which such added pool or pools or portion thereof is expected to make during the remaining course of unit operations, to the total production of oil or gas, or both, so allocated. The production so allocated to such added pool or pools or portion thereof shall be allocated to the separately owned tracts which participate in such production on the basis of the relative contribution of each such tract, as provided in paragraph (c) of section 179(72) herein. The remaining portion of unit production shall be allocated among the separately owned tracts within the previously established unit area in the same proportions as those specified in the previous order. Orders promulgated under this paragraph shall become operative at seven o'clock (7:00) A.M. on the first day of the month next following the day on which the order becomes effective under the provisions of paragraph (b) of this section.

"(b) An order promulgated by the board under paragraph (a) of this section shall not become effective unless and until (1) all of the terms and provisions of the unitization agreement relating to the extension or enlargement of the unit area or to the addition of pools or portions thereof to unit operations have been fulfilled and satisfied and evidence thereof has been submitted to the board, and (2) the extension or addition effected by such order has been agreed to in writing by the owners of at least seventy-five per centum (75%) in interest as costs are shared of the area or pools or portions thereof to be added to the unit operation by such order and by seventy-five per centum (75%) in interest of the royalty and overriding royalty owners in the area or pools or portions thereof to be added to the unit operations by such order, and evidence thereof has been submitted to the board. In the event both of the above requirements are not fulfilled within six (6) months from and after the date of such order it shall be automatically revoked.

\* \* \* \* \* \*"

Paragraph (c) of § 179(72) referred to in Paragraph (a) of § 179(74) reads:

"An allocation among the separately owned tracts in the unit area of all the oil and gas, or both, produced from the unit pool within the unit area, and not required in the conduct of such operation or unavoidably lost, such allocation to be based on the relative contribution which each such tract is expected to make, during the course of such operation, to the total production of oil or gas, or both so allocated."

In its decree, after summarizing the provisions of § 179(74), the trial court found:

" \* \* \* that in the proceedings, and the orders, appealed from, the State Oil and Gas Board of Alabama did not first allocate to each pool or portion thereof to be added to the Unit Area, a portion of the total production of oil from all pools affected within the Unit Area, as enlarged; did not determine, from evidence before it, the relative contribution which each such added pool or portion thereof was expected to make, during the course of unit operations, to the total production of oil, so allocated; and, from the evidence before it, did not then allocate to the separately owned tracts which would participate in such production the production so allocated, or which should have been allocated, to each added pool or portion thereof, on the basis

of the relative contribution of each such tract."

In Order 65–28, the only language which we can find which purports to show a compliance with the provisions of § 179(74) is as follows:

"I.

"That all of the production of the unitized substances [oil] from the unit pool or unit area, as enlarged, shall first be allocated to that portion of the unit area, as enlarged, which is hereby added to the present unit area on the basis of the relative contribution which said added area is expected to make, during the remaining course of unit operations to the total production of oil or gas or other unitized substances, so allocated, and not required in the conduct of unit operations or unavoidably lost. That said production so allocated to that portion of the unit area, as enlarged, which is added to the present unit by this order shall be allocated to the separately owned tracts which participate in said production on the basis of the relative contribution of each such tract in the area added to the present Citronelle Unit. That the remaining portion of the unit production from the unit area, as enlarged, shall be allocated among the separately owned tracts within the previously established unit area in the same proportions as was specified in Order No. 166, dated April 26, 1961, of this Board."

We entertain the view that the provisions of § 179(74) apply where a portion of a pool not previously affected by an existing unit operation is added to that operation by an enlargement order, as well as to instances where the enlargement order adds to unit operations new pools or portions thereof.

We do not wish to be understood, however, as holding that the evidence adduced before the Board was not sufficient to support a finding that only one pool was involved. It was sufficient.

Appellee, Ancora, argues in effect that the language last quoted above from Order 65–28 is not a compliance with the requirements of § 179(74) in that while it paraphrases the language of said section, the Board has not made the allocations required thereby; that the Board has merely delegated its authority to make the allocations which the law requires it to make to the unit manager of the Citronelle Unit or to the working interest owners of that Unit.

Ancora's position might be well taken if such language was the only action of the Board which can be said to show a compliance with § 179(74). But Order 65–28 was not a final order and it must be read in connection with Order 66–5, that is, the order of the Board rendered on March 15, 1966, finalizing said order 65–28. In its Order 66–5 appears the following: "That 'Second Enlargement Agreement, Citronelle Unit, Mobile County, Alabama,' is hereby approved." It seems to us .that in view of this action of the Board, the Second Enlargement Agreement must be considered in arriving at a determination as to whether or not the Board did in fact make the allocations required by § 179(74) or whether it has simply delegated that responsibility to its subordinates.

In the Second Enlargement Agreement, which was introduced in evidence, appears the following language:

"All Unitized Substances [oil] produced and saved from the Unit Area as enlarged hereby shall be apportioned among and allocated to the several Tracts within the Unit Area as enlarged hereby in accord with their respective Tract Percentages of Participation as shown in Exhibit B–2 attached hereto which lists each numbered Tract in the Unit Area as enlarged hereby and includes the folowing information concerning each such Tract:

"(1) Column (1) sets forth the Tract Number, the name of the well on such Tract, if any, and the description of the

Tract, all of which Tracts are in Mobile County, Alabama.

"(2) Column (2) sets forth with respect to each such Tract the Tract Participation of such Tract in the Unit Area as enlarged hereby.

"Exhibit B–2 has been computed by the Unit Manager and has been approved by the Operators Committee pursuant to the provisions of the Unitization Agreement and, from and after the Effective Date of this Second Enlargement as herein provided, Exhibit B–2 shall supersede and take the place of Exhibit B–1 attached to the First Enlargement Agreement and shall supersede and be in lieu of Exhibit B, as incorporated in the Operating Agreement by reference, as Exhibit B was revised by Exhibit B–1 to the First Enlargement Agreement, and the Unit Manager shall revise said Exhibit B accordingly."

An examination of Exhibit B–2 to the Second Enlargement Agreement shows that allocations have been made separately to the tracts included in the original Citronelle Unit (Order 166) and separately to the tracts brought into that Unit by the first enlargement proceedings (Order 199) and separately to the ninety-four tracts brought into the Unit by Orders 65–28 and 66–5.

In view of the above, we cannot agree with Ancora's position that the Board has left up to subordinates the responsibility of determining the allocations required to be made by § 179(74). By approving the Second Enlargement Agreement, the Board in effect incorporated it into its orders here involved. The allocations as made in the Second Enlargement Agreement as those of the Board and the responsibility of the Unit Manager or other Unit officials goes no further than to put into effect the allocations which the Board has prescribed.

If the trial court did, in fact, base its action setting aside Orders 65–28 and 66–5 on the ground that the Board itself had not made the allocations required by § 179(74)

but had delegated that responsibility to its subordinates, we cannot agree that such action was correct.

We will now consider whether the Board used the proper formula in arriving at the amount of oil to be allocated in the manner provided by § 179(74), which in Paragraph (b) thereof provides, in part, as follows:

"(b) An order promulgated by the board under paragraph (a) of this section shall not become effective unless and until (1) all of the terms and provisions of the unitization agreement relating to the extension or enlargement of the unit area or to the addition of pools or portions thereof to unit operations have been fulfilled and satisfied and evidence thereof has been submitted to the board * * *."

Article 10 of the original Unitization Agreement bears the caption, "Enlargement of the Unit Area and Field Area." That article provides for the enlargement of the Unit Area by two separate and distinct methods: (1) Automatic enlargement for certain tracts on specified dates, and (2) negotiated enlargement.

In regard to automatic enlargement, it is provided in Article 10.1.2(a) as follows: "Subject to the other provisions of this Article the Tract participation of each Tract shall be calculated by the application of the same Formula as was applied to Tracts originally in the Unit Area."

The formula applied to "Tracts originally in the Unit Area" was a three-factor formula, each given equal weight, namely, (1) the Six-months Production Factor (production rates), (2) the Microlog Area Foot Factor (acre feet), and (3) the Oil in Place Equivalent Acre Foot Factor (oil or reserves).

The participation formula developed by the Citronelle Unit for the second enlargement (the enlargement under consideration here) and approved by the Board, gives two-thirds weight to "Productive Acre Feet" (same as Microlog Acre Feet used in the original formula), and one-third

weight to production for the last six months of 1964. The new formula, therefore, gives no consideration to the Oil in Place Equivalent Acre Foot factor included in the original formula.

It is contended, therefore, that the Board in approving the new formula did not comply with the requirements of § 179(74) (b).

We do not agree with this contention. As noted above, Article 10.1.2(a) applies only to automatic enlargements and it is beyond question that the enlargement with which we are presently concerned is not an automatic enlargement within the meaning of Article 10 of the original Unitization Agreement.

In Article 10.1.1(d) it is provided:

"Notwithstanding any other provisions of this Article, Operators are fully authorized and empowered to extend and enlarge at any time and from time to time the Unit Area and Field Area and to that end may negotiate, execute and perform contracts with the owners of interests in a Tract or a group of Tracts known or reasonably estimated to be productive of oil, gas and other hydrocarbons from the Rodessa Formation in commercial or paying quantities. Any such contract shall be entered into so that the effect of same shall be to include such outside acreage in the Unit Area, but the basis of inclusion of any such Tract in the Unit Area and the Tract Percentage of Participation of such Tract shall be on a negotiated basis. Such contracts shall be fair and reasonable and in conformity with the laws of the State of Alabama."

Appellant says that the provisions just quoted authorize the use of a formula different from that used in the original Unitization Agreement in that the ninety-four tracts involved in the second enlargement were brought into the Unit under a negotiated basis.

Appellees did not agree that the tracts in which they are interested (Ancora, 8 tracts; Seaman, 1 tract; and Plemmons et al., 1 tract) be brought into the Citronelle Unit. Hence, they say, the Second Enlargement was not made on a negotiated basis so as to authorize the use of a formula different from that spelled out in the original Unitization Agreement or, in other words, that the provisions of Article 10.1.1(d) have no application.

■ We do not think that the provisions of Article 10.1.1(d) should be construed to require the approval of the owner of each tract within an area sought to be added to the Citronelle Unit by negotiation. If so construed it would, in our opinion, run counter to the legislative intent as expressed in the hereinafter quoted parts of § 179(74) (b):

"An order promulgated by the board under paragraph (a) of this section [enlargement order] shall not become effective unless and until * * * (2) the extension or addition effected by such order has been agreed to in writing by the owners of at least seventy-five percentum (75%) in interest as costs are shared of the area or pools or portions thereof to be added to the unit operation by such order and by seventy-five percentum (75%) in interest of the royalty and overriding royalty owners in the area or pools or portions thereof to be added to the unit operations by such order, and evidence thereof has been submitted to the board. * * *"

We think that a reading of Article 10 of the original Unitization Agreement shows that it was set up to take care of two different situations. Article 10.1.1(a) (b) and (c) and Article 10.1.2 with all of its subparagraphs, apply to automatic enlargements provided for in Article 10.1.1(a) (b) and (c) on the first, second and third year after the effective date of the original Unitization Agreement or on January 1, 1962, 1963 and 1964, whichever is the later. If Article 10.1.1(d) be construed as insisted upon by the appellees, then the Citronelle Unit could not be enlarged after the times referred to above until the owner of each

forty-acre tract in a proposed addition gives his consent, a most unrealistic and unauthorized requirement in view of the provisions of § 179(74) (b) last quoted above.

■ Article 10.1.1(d), in our opinion, was intended as a completely separate type arrangement for enlargement and it does not require any of the conditions set out in the remaining portion of Article 10, nor does it require a tract percentage of participation factor in accordance with the definitions of Article 2.6 or Article 5 of the original Unitization Agreement.

A reasonable interpretation of the provisions of the Second Enlargement Agreement and its adoption of the definitions contained in the original Unitization Agreement does not create any conflict between the provisions of the Unitization Agreement, using a three-part formula, six-months production factor, microlog acre foot factor, and oil in place equivalent foot factor, and the second enlargement agreement, which uses only the six-months production factor and a net productive acre foot factor.

In our opinion, if a reasonable interpretation be given to the provisions of Article 10.1.1(d) quoted above, it follows that the participation factor for new areas to be added to the Citronelle Unit, other than automatic enlargements, can be based on a different formula from that used in the original Unitization Agreement.

If the trial court did, in fact, base its action setting aside Orders 65–28 and 66–5 on the ground that the Board, in arriving at the allocation to be made under the provisions of § 179(74), did not use the formula provided in the original Unitization Agreement, we cannot agree that such action was correct.

■ In the brief filed by Ancora in support of the decree of the trial court, it is asserted: "The formula unilaterally adopted by the operators of the Citronelle Unit does not meet the requirements of the statute, is unreasonable, unsupported by the evidence and deprives Ancora and others of their property without due process of law."

No statute is mentioned in the argument made in support of that assertion, but we assume that the statutory provisions which the writer of the brief had in mind are those found in § 179(72) (c), which we have set out above but which we will quote again:

"An allocation among the separately owned tracts in the unit area of all the oil or gas, or both, produced from the unit pool within the unit area and not required in the conduct of such operations or unavoidably lost, such allocation to be based on the relative contribution which each such tract is expected to make, during the course of such operation, to the total production of oil or gas or both, so allocated."

We are constrained to observe that we are not certain that we fully understand the argument of Ancora in the section of its brief presently under consideration.

We believe, however, that Ancora contends that the formula used, that is, the two-factor formula to which we have previously alluded, does not give to each of the ninety-four added tracts the relative contribution of oil which each such tract is expected to make to the total production of oil expected to be produced from the entire Unit as enlarged.

But we are not certain as to the reasons why Ancora says that such is the result of the use of the two-factor formula.

As we understand the testimony of the expert witnesses and the many exhibits introduced into evidence, the formula used in the Second Enlargement was developed only after studies of then current maps of the oil sands under the Unit, as enlarged, had been made. The Board's experts agreed that the formula used was the best. available at the time, In fact, we believe the evidence supports a finding that the formula used in the Second Enlargement is

basically the same as that used in the original unitization and the first enlargement. The formula used in the Second Enlargement gives two-thirds weight to the productive acre foot and one-third weight to production for the last six months of 1964. It might be said that the difference in the two formulas is one of semantics. The two-thirds weight given to productive acre feet seems to us to be substantially the same thing as giving one-third weight to microlog acre feet and one-third weight to oil in place equivalent acre feet. In any event, the change in formula was made only after exhaustive studies had been made by experts who had been employed by the Unit Manager to prepare isopachous maps of the sands in the Citronelle Field. These maps were used to determine the productive acre foot factor which was used in the formula. An expert whose qualifications were conceded by Ancora testified that the "subcommittee" was of the opinion that those maps were the most accurate, up-to-date interpretation of the reservoirs in the Citronelle Field.

There was no testimony before the Board to show that the Citronelle Unit, under the two-factor formula, would receive more than its share of the oil in place.

The evidence does not support Ancora's contention, as we understand it, that all of the oil of the Citronelle Unit which could be produced by primary recovery had been exhausted at the time of the hearing before the Board.

We cannot agree that the record does not show any evidentiary facts advanced by the Citronelle Unit for the substitution of the formula used in the initial creation of the Unit and the First Enlargement.

The two-factor formula was initially selected by the Citronelle Unit's Operators Committee, but that formula was explained to each interest owner by the Unit Manager.

That formula was approved and adopted by the Board only after it received the isopachous maps and heard testimony concerning the fairness of the formula to all parties

concerned and that the wells in the Citronelle Unit and the new 94-tract wells would be treated equally under the formula; that is, that the existing Unit and each of the ninety-four tracts in the Enlargement Area would share in the future production of oil on the same basis as each contributed to future production.

We understand the evidence to show that the same formula was applied to both the existing Citronelle Unit and the ninety-four tracts in determining the productive acre feet of the tracts in the Citronelle Unit and the ninety-four tracts.

The reason the last six months of 1964 was used in the production factor was because it was the last period of continuous operation for which the Citronelle Unit had up-to-date production figures when the enlargement study was made.

Ancora says that the Board heard nothing but opinions, which were unsupported by facts. That statement is much too broad. The record is replete with factual testimony covering every material point involved in the court's decision. Further, there were over one hundred exhibits before the Board, which provided factual support of the testimony presented to the Board.

In regard to the expert witnesses, it should be noted that counsel for Ancora did not question their qualifications to testify as experts in the field of gas and oil. Actually, in practically every instance, if not at all, counsel for Ancora expressly recognized that the witness possessed the necessary qualifications to testify as an expert.

The evidence tends to show that the total recoverable oil in the 247-tract Citronelle Unit is 92,747,262 barrels, and the recoverable oil in the ninety-four-tract area is 15,020,000 barrels. Total amount of recoverable oil in the Citronelle Unit, as enlarged, is 107,767,262 barrels. Of this total amount, fifteen-plus percent was allocated to the ninety-four tracts and eighty-four-plus percent was allocated to the 247-tract Citronelle Unit. Under the testimony before the Board, the 94-tract area will

receive over fifteen percent or approximately 16,363,000 barrels out of the 107,-767,262 barrels of oil remaining, whereas those tracts will only contribute 15,020,000 barrels of oil. The Citronelle Unit, under the formula used, will receive only eighty-five percent or approximately 91,407,000 barrels out of the 107,767,262 barrels of oil remaining, whereas that Unit will contribute over 92,700,000 barrels of oil.

Ancora argues that the partially watered out sands underlying the Citronelle Unit were not considered. But the participation formula also did not make any deductions for the so-called tight or marginal sands on the edge of the Citronelle Field where the 94-tract area is located. The edge or marginal sands may not produce as well as the sands in the middle of the Citronelle Field, where the majority of the Citronelle Unit tracts are located.

In view of the foregoing, we cannot agree that the formula used in the Second Enlargement does not meet the requirements of § 179(72) (c), or is unreasonable or is unsupported by the evidence or deprives Ancora and others of due process of law.

What we have said above in regard to Ancora's assertion about the formula used in the Second Enlargement is applicable to the same contention made in Section B of the argument in the Seaman brief, and we will not hereinafter make reference to the argument made in that section of the Seaman brief.

We cannot agree with Ancora's insistence that the orders of the Board here involved should have been set aside because the Board did not include in those orders provisions for the protection of the coequal and correlative rights of owners in interest in Ancora's East Citronelle Unit in the common oil pools underlying that Unit and Citronelle Unit as enlarged, in that no provision was made for a cooperative injection agreement between Ancora's East Citronelle Unit and the Citronelle Unit as enlarged.

It is obvious, of course, that Ancora is not really concerned about the eight tracts in which it owns interests which were brought into the East Citronelle Unit, but with its East Citronelle Unit which was formed in 1964. As we understand the evidence, at the time the East Citronelle Unit was established, it had almost five miles of common boundary with the Citronelle Unit as it then existed. As far as we can determine, Ancora did not ask for or seek a cooperative injection agreement as a prerequisite to the unitization of its tracts adjacent to the Citronelle Unit and it does not appear that any such requirement was included in the Board's order or orders approving the creation of the East Citronelle Unit. It appears that Ancora wishes to begin an injection program which would change the location of the oil, and would possibly sweep some oil from its unit to the Citronelle Unit, and that Ancora wants the Board to require the Citronelle Unit to inject in a manner which will sweep oil from the Citronelle Unit to the East Citronelle Unit.

This is a matter which we think should be handled by having the Board require a boundary line agreement. In fact, the record shows that during the course of the hearing before the Board on October 15, 1965, the Chairman of the Board advised counsel for Ancora that the Board would be glad to hear any party to that proceeding who wished to petition the Board for a hearing on boundary line questions. Ancora immediately filed its petition with the Board seeking a boundary line agreement. At its December 17, 1965, meeting the Board considered the petition of Ancora after a full hearing was held. By Order No. 65–29, dated December 17, 1965, the Board granted Ancora's petition for a boundary line agreement to the extent of requiring all three interested parties to file proposed plans. By said Order No. 65–29, the Board indicated that unless full field-wide unitization occurs, they will require a boundary line agreement. In other words, because of the complexities involved in

boundary line or cooperative injection agreements, the Board chose as a matter of procedure to hear the boundary line agreement question separately.

No damage can be done to the East Citronelle Unit by the Citronelle Unit as enlarged until an injection program is started. Before an operator can convert an oil producing well into an injection well, the operator thereof must seek the approval of the Board, which approval must be sought by separate application.

The statement in Ancora's brief to the effect that the Board at its hearings refused to consider testimony pertaining to the co-equal or correlative rights of the interested parties is incorrect.

Ancora argues in its brief that the orders of the Board presently under consideration violated federal and state anti-trust laws. In regard to this contention, it is sufficent to say that that question was not adequately presented to the trial court in the bill filed by Ancora.—Riley v. Smyer, 265 Ala. 475, 91 So.2d 820; Gardner v. Stevens, 269 Ala. 213, 111 So.2d 904; Smith v. State, 280 Ala. 241, 192 So.2d 443.

Ancora, in what appears to be another afterthought, argues in its brief that the orders of the Board here under review violate the fundamental requirements of a hearing as enunciated by the United States Supreme Court in Morgan et al. v. United States et al., 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288, in that a majority of the members of the Board who made the orders did not hear the testimony.

This question was not adequately presented to the trial court in the bill filed there by Ancora. However, since it might be said that Ancora's contention presently under consideration goes to the jurisdiction of the Board to enter the orders, we will respond briefly to Ancora's insistence.

If we understand Ancora's argument, it is that the Board was not properly constituted at all times during the hearing; that

therefore the Board did not have jurisdiction, or its actions were unconstitutional. Ancora objects to the fact that only one member of the Board who entered the orders had heard all the October 15, 1965, evidence and the evidence presented at the December 17, 1965, meeting. However, the transcript shows that there were two members of the Board present at all times during the October and December, 1965, hearings. It is provided in § 179(29) that: "Two members of the board shall constitute a quorum, but two affirmative votes shall be necessary for the adoption or promulgation of any rule, regulation, or order of the board."

The transcript shows that all members of the Board voted in favor of the enlargement petition. The transcripts of all the proceedings held by the Board are available at all times for any new member or any absent member to read concerning the evidence presented at any hearing.

The Chairman of the Board, Mr. Hanby, was present during the taking of all the evidence. Mr. Glaze excused himself from a part of the hearing during the latter part of the afternoon of October 15, 1965, due to illness. Mr. Britton heard all the evidence offered by the Citronelle Unit in support of its petition for the enlargement of the Citronelle Unit and Ancora's cross-examination, but Mr. Britton's term expired before the case was finally decided and he was not reappointed to the Board. Mr. Eddins was appointed to Mr. Britton's Board position. He heard all of the testimony offered by Mr. Tully on behalf of Seaman and Plemmons et al. on December 17, 1965.

We do not believe that it can be said that the Board was without jurisdiction to render the orders here under review for the reason asserted by Ancora.

Ancora and Seaman contend that Order 65-28 of December 17, 1965, is invalid in that it was not rendered within thirty days from the date of the first hearing, to wit, October 15, 1965, nor ·was an

order of continuance entered by the Board within thirty days from the last-mentioned date.

We find no merit in this contention.

We have heretofore shown that at the conclusion of the hearing on October 15, 1965, the Chairman of the Board stated in effect that the Board would take the matter under advisement.

Section 179(33) (F) provides:

"Any interested person shall have the right to have the board call a hearing for the purpose of taking action in respect to any matter within the jurisdiction of the board by making a request therefor in writing. Upon the receipt of any such request, the board promptly shall call a hearing thereon and, after such hearing, and with all convenient speed, and in any event within thirty (30) days after the conclusion of such hearing, shall take such action with regard to the subject matter as it may deem appropriate."

As we have heretofore shown, Mr. Tully, representing himself, Plemmons et al. and Seaman, appeared at the hearing on December 17, 1965, and over the objection of counsel for the Citronelle Unit was permitted to present evidence. Mr. Darby, counsel for Ancora, was present at that time and made no point of the fact that additional testimony could not be heard or that the Board's right to enter an order on the Stein petition had expired because no such order had been entered within thirty days from October 15, 1965, nor an order of continuance during that thirty-day period.

Moreover, at the March 18, 1966, meeting of the Board the whole record was reintroduced so that Order 66-5, from which an appeal has been taken, was made within thirty days after the conclusion of the hearing in which the whole record was introduced and was before the court.

We also point out that neither Ancora, Seaman nor Plemmons et al. raised this question in the bills which they filed in the Circuit Court of Mobile County, in Equity.

■ There is no merit in Ancora's contention that the orders of the Board here under review are not supported by the evidence. Although there is no statutory requirement that there must be substantial evidence to support a finding by the Board, as is the case of an order of the Alabama Public Service Commission (§ 82, Title 48, Code of Alabama), there was, in our opinion, substantial evidence to support the findings of the Board.

The record is replete with testimony which shows that on each point raised on this appeal there was sufficient evidence to support the order. True, much of the testimony was opinions expressed by experts. But after several months of work on the record in this case, we are clear to at least one conclusion and that is that testimony in a case of this kind can only come from experts, and we think the record is filled with factual testimony by the expert witnesses upon which to base their opinions.

■ At this point, we observe that we do not review the decree of the trial court with any presumption of its correctness, since that court was in no better position to review the orders of the Board than this court. The orders of the Board have been reviewed as though the appeal had been taken directly to this court.—Alabama Public Service Commission v. Redwing Carriers, Inc., 279 Ala. 659, 189 So.2d 342.

Our inquiry has been limited to a determination of whether the tendencies of the evidence and reasonable inferences to be drawn therefrom support the orders of the Board in that the issues presented by the bills filed by appellees were for a decision by an administrative body, a body of experts whose business calls for such decisions in its ordinary course.—Dark's Dairy v. Alabama State Milk Control Board, 278 Ala. 693, 180 So.2d 527.

The rule concerning the limitations upon the scope of this court's review in deter-

mining the validity of an administrative board's order was clearly stated in Barnes v. State ex rel. Ferguson, 274 Ala. 705, 712, 151 So.2d 619, as follows:

"In the absence of statutes or other factors affecting the customary scope of judicial review, it is settled that on review of administrative determinations it is not for the courts to substitute their judgment for findings of fact made by the administrative authorities. The courts may not make an independent determination of the matters before the administrative authority on all the evidence, as upon a trial de novo, and are without power to make any findings or contrary findings of fact, for to annul an administrative finding of fact solely on the ground that the evidence would have warranted a different finding would be to substitute the judgment of the court for the judgment of the administrative agency upon matter purely administrative, and this cannot be done. The judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings."

▉ The fact that a majority of persons attending the meeting of the Citronelle Unit Operators Committee voted against recommending to the Board that an appeal be taken from the decree of the trial court could in no wise affect the right of the Board to appeal from that decree. This point is raised in Ancora's brief.

▉ The brief filed by Mr. Tully on behalf of Seaman and Plemmons et al. takes the position that there was no legal evidence to support at least two points: (1) jurisdiction, and (2) the Order (66–5) itself. The point of proof as regards jurisdiction concerns the matter of notice. Section 179(33) provides in pertinent part as follows:

"(A) The board shall publish its rules of order or procedure in hearings or other proceedings before it under this article. (B) No rule, regulation, or order, including any change, renewal, or exten-

sion thereof, shall, in the absence of an emergency, be made by the board under the provisions of this article except after a public hearing upon at least ten days' notice, *given in the manner and form as may be prescribed by the board.* * * *" (Emphasis supplied)

The Board on September 3, 1946, issued its "Order No. 1," in booklet form, entitled "General Order Prescribing Rules and Regulations Governing the Conservation of Oil and Gas in Alabama." Rule A–2 provides for notice. Rule A–2 was amended by Board Order No. 194 promulgated on June 22, 1962, so as to read in pertinent part as follows:

" * * * Notice to the public and interested parties shall be given ten (10) days before the hearing is held * * * The notice shall specify the date of hearing, the place of hearing, and the subject matter of the hearing and shall be published in a major newspaper in Birmingham, Montgomery, and Mobile, Alabama, and such other newspaper as deemed appropriate by the State Oil and Gas Supervisor."

At the Board hearing on October 15, 1965, which convened for the purpose, inter alia, to hear the Stein petition for the Second Enlargement, the Board Chairman asked the following question:

"I will now ask the acting Supervisor if this meeting has been properly advertised according to law.

"Mr. Harris: Mr. Chairman, the meeting has been properly advertised according to law."

It is the position of Seaman and Plemmons et al., as we understand it, that this was not sufficient proof.

We do not understand that Seaman and Plemmons et al. are claiming that they were entitled to personal service, but that the evidence was not sufficient to show that notice by publication had been made.

While we think it would have been better if proof of the published notice had been

introduced, we think that the statement of Mr. Harris was sufficient, in the absence of any question being raised before the Board as to its sufficiency. True, Mr. Tully was not present at the October 15, 1965, meeting, but he was present at the meeting held on December 17, 1965, and at that time made no objection to the inadequacy of proof of notice of the meeting of October 15, 1965, and in fact insisted that he be permitted to present testimony in regard to matters which had been considered at the meeting held on October 15, 1965. Moreover, this question was not raised in the bills filed in the trial court by Seaman and Plemmons et al.

 In the Ancora brief, as well as in the Seaman brief, the position is taken that sufficient evidence was not presented to the Board to show consent or ratification by at least seventy-five percent of the interests as costs are shared and seventy-five percent of the royalty owners of the Unit Area as required by § 179(73). We do not agree.

The then Unit Manager, Mr. Stein, testified as the only person with personal knowledge concerning the obtaining of said approvals and all matters to which he testified were within his personal knowledge, based on an examination of the documents he had sent out to the owners and the replies which he had received. McElroy, in "The Law of Evidence in Alabama," 2nd Ed., Vol. 2, p. 151, § 220.01, entitled "Excuse for Nonproduction: Testimony as to Net Result of Examination of Voluminous Documents," says:

> "If a fact to be proven requires an inspection and compilation of numerous and voluminous documents and if inspection and compilation by judge or jury at the trial is unreasonable, impracticable, or impossible; a qualified witness, e. g., an accountant, who has made an examination of such documents may state the result of his computations therefrom if, but only if, the mass of documents is made available to the opponent for inspection."

Mr. Stein stated that the ratification had either been recorded in the office of the Probate Judge in and for Mobile County, Alabama, or that the ratifications were included in an affidavit by the Unit Manager and recorded in the office of the Probate Judge in and for Mobile County, Alabama.

As to the general rules concerning the admissibility of evidence before a public administrative body, see 73 C.J.S. Public Administrative Bodies and Procedure, § 125, p. 445. Also see Barnes v. State ex rel. Ferguson, 274 Ala. 705, 151 So.2d 619, from which we quoted above.

Admittedly, some of the ninety-four added tracts had not been in production twenty-one months or longer. But the provisions of Article 10.1.2(c) of the Unitization Agreement, which relates to such a requirement, applies only to automatic enlargement and we have said above that we are involved here with a negotiated enlargement. This point is raised in Seaman's brief.

This case has been given careful and prolonged consideration by this court. It presents many complex questions, most of which are of first impression. We have encountered much difficulty in understanding the technical aspects of the evidence. With all deference to the learned judge who presided at the trial below, we are constrained to the conclusion that the decree here under review is erroneous and that it should be reversed with directions.

It follows that the decree of the trial court is reversed and the cause is remanded to the Circuit Court of Mobile County, in Equity, with directions to enter a decree upholding the validity of Orders 65–28 and 66–5 of the Board.

Reversed and remanded with directions.

LIVINGSTON, C. J., and MERRILL, HARWOOD and MADDOX, JJ., concur.