This is a State of Alabama Oil and Gas Board case.
On May 31, 1982 Getty Oil Company (Getty) first petitioned the State of Alabama Oil and Gas Board (the Board) to unitize Hatter's Pond field, a gas condensate reservoir located in Mobile County. Unitization was sought by Getty as unitization is a precondition to the implementation of secondary recovery operations in a field.
Secondary recovery involves the recovery of hydrocarbons by artificially maintaining pressure throughout the reservoir. Secondary recovery, as compared to primary recovery, is desirable because through pressure maintenance more hydrocarbons can be retrieved from the reservoir. Additionally, interest owners like Getty, operating in a unitized field and engaging in secondary recovery, are allocated revenues pursuant to a participation formula rather than according to the amount of hydrocarbons retrieved from their individual well or wells.
Pursuant to section 9-17-83(3), Code 1975, a participation formula adopted in response to a petition for unitization must be: *Page 252 
 "An allocation among the separately owned interests derived from or associated with tracts in the unit area of all the oil or gas, or both, produced from the unit pool within the unit area, and not required in the conduct of such operation or unavoidably lost, such allocation to be based on the relative contribution which each such tract or interest is expected to make during the course of such operation, to the total production of oil or gas, or both, so allocated."
Evidence was presented to the Board in an initial set of hearings by the various interest owners in the field concerning the need for unitization and the appropriate unitization plan. Getty proposed a participation formula for unitization based entirely on pore volume, and the unit area initially proposed by Getty did not include sections 21 and 28, T2S, R1W. The Board issued order No. 83-170, in response to the evidence and unitization petition, on July 29, 1983.
For purposes of appeal, the pertinent findings of the order were, in summary: (1) unitization should be implemented to prevent unnecessary loss of hydrocarbons in the field; (2) the appropriate participation formula for the field should not be based entirely on pore volume, but rather sixty percent on pore volume and forty percent on productivity; (3) the productivity factor of the formula should be defined in terms of a tract's average daily production rate, average daily production being a well's best month of production on the tract; (4) no adjustments to pore volume should be made to reflect pressure-production history, remaining recoverable reserves or present worth of unitized substances; (5) the SE/4 of section 8 and a portion of the NW/4 of section 11, T2S, R1W should be included in the unit area; (6) the SW/4 of section 27 and the S/2 of section 28, T1S, R1W should be included in the unit area; (7) whether any part of sections 28 and 33, T2S, R1W, would be included in the unit area should be determined only after further review by a committee of experts.
Pursuant to these findings the order directed Getty "to immediately prepare a unitization proposal including a Unit Agreement, a Unit Operating Agreement and Special Field Rules." The Board further ordered, inter alia, that: (1) a committee of experts be formed to further map sections 21, 22, and 28; T2S, R1W; (2) Getty should redetermine tract participations in accordance with the 60/40 formula; (3) Getty should promptly submit a new petition for unitization to the Board.
In accordance with the Board's order, an expert committee was formed which met from September 14, 1983 until December 15, 1983. Tract participations were redetermined pursuant to the 60/40 formula, and Getty filed its new unitization petition on February 10, 1984.
Pursuant to the new petition, the Board heard more evidence and reviewed the data prepared by the expert committee. It was also during these proceedings that appellees asked the Board to exercise its subpoena power and require Getty to produce some specified documents.
In response, the Board promulgated order No. 84-382 with the following findings, inter alia: (1) sections 21, 28, and the NW/4 of section 22, T2S, R1W should be included in the unit area; (2) the 60/40 participation formula was supported by substantial evidence; (3) the productivity factor, comprising forty percent of the formula, should be determined from a tract's average daily production rate, average daily production being a well's best month of production on the tract through September 30, 1984, which was the last full month of production before the order's issuance; (4) the appellees' proposed productivity factor, encompassing a shorter time frame than that adopted by the Board, was inappropriate as it failed to consider all the factors necessary in creating a fair productivity factor; (5) earlier findings that adjustments to pore volume not be made should be reaffirmed; (6) no evidence was received which indicated the existence of separate mappable reservoirs in the field; (7) the SE/4 of section 8, T2S, R1W; the NW/4 of section 11, T2S, R1W; a portion of section 22, T2S, R1W; the SW/4 of section 27, T1S, R1W; and the S/2 of section 28, T1S, *Page 253 
R1W should be included in the unit area; (8) the discovery requests filed by appellees should be denied.
In accordance with these findings, the Board decreed, inter alia, that the 60/40 formula should be adopted with productivity being a tract's average daily production rate, average daily production rate being a well's best month of production through September 30, 1984.
In its third order regarding Hatter's Pond, the Board acknowledged ratification of the unit agreement and unit operating agreement by the statutorily required percentage of interest owners. Consequently, the Board directed that unit operations commence May 1, 1985.
Pursuant to sections 9-17-15 and 41-22-20, Code 1975, three groups of interest owners appealed from the Board's order to the Circuit Court of Mobile County. For purposes of this appeal, the two pertinent groups and their contentions were, in summary: (1) Arden A. Anderson, et al., who represented owners in section 28, T2S, R1W and one owner in section 35, T1S, R1W, maintained that the Board-adopted formula failed to meet the statutory requirements of section 9-17-83(3), Code 1975; and (2) Hatter's Alabama, et al., who owned an interest in section 28, T2S, R1W as well as other sections, also alleged that the Board formula failed to follow the statutory directive in section 9-17-83(3), Code 1975.
We have previously stated that in order to unitize Hatter's Pond field it was necessary for the State Oil and Gas Board to develop a participation formula. Initially, Getty proposed a participation formula based entirely on pore volume. Getty supported the proposal with expert testimony and exhibits. Although experts for most of the other parties agreed that pore volume was a valid indicator of a tract's future production, they supported the adoption of a participation formula which included other factors in addition to pore volume. These experts maintained that the additional factors would result in a formula more protective of the coequal and correlative rights of the interest owners.
Several alternative formulas were proposed by the parties, including formulas based: (1) 50% on pore volume and 50% on historical average daily production; (2) on at least 50% productive capacity; (3) on past average daily production; (4) 50% on pore volume and 50% on productive acreage; (5) 100% on cumulative production; (6) 50% on pore volume and 50% on well tests; and (7) 50% on "highest tested capacity" and 50%adjusted pore volume. The participation formula ultimately adopted by the Board was based on two factors. The first factor, comprising sixty percent of the allocation formula, was based on pore volume. The second factor was based on productivity and accounted for the remaining forty percent of the formula. Further, the Board defined productivity as a tract's average daily production, average daily production being a well's best month of production on the tract.
Although the circuit court upheld the Board's order with regard to the inclusion of a productivity factor, the court found that productivity as defined by the Board was unreasonable and was unsupported by the evidence. Appellants support the productivity factor as defined by the Board and have appealed the circuit court's holding.
We first note the flexibility afforded the State Oil and Gas Board in issuing relief pursuant to a petition for unitization:
 "Entry of Rules, Regulations, and Orders. During or after conclusion of any hearing, including continued sessions thereof, the Board shall promptly take such action as it may deem appropriate concerning the subject matter being considered by the Board. . . ." (emphasis added)
Rule 400-1-12-.23, State Oil and Gas Board of Alabama Administrative Code.
The rule further provides the Board is not bound to grant the specific relief asked for in a petition but may amend or take "other appropriate action regarding the petition." Rule400-1-12-.23, supra. Likewise, section 9-17-7(f), Code 1975, gives the Board great flexibility in fashioning relief: *Page 254 
 "[T]he Board . . . shall take such action with regard to the subject matter thereof as it may deem appropriate." (emphasis added)
Our review of an order issued by the Oil and Gas Board pursuant to these provisions, as was the review by the Circuit Court of Mobile County, is governed by section 9-17-15, Code 1975. Absent any allegation that the Board acted without or in excess of its jurisdiction in issuing the order or that the order issued was unconstitutional or procured by fraud — and there was none, — we are restricted to an examination of whether the order was reasonable and supported by the evidence. § 9-17-15, Code 1975.
In examining the reasonableness of the order, we have previously stated that "[a] determination by an administrative agency is not . . . 'unreasonable' where there is reasonable justification for its decision." Hughes v. Jefferson CountyBoard of Education, 370 So.2d 1034 (Ala.Civ.App. 1979). Further, the Board's orders "are presumed to be prima facie correct" and, if we determine that evidence was offered which supports the order, then we must affirm. Roberts v. State Oil Gas Board, 441 So.2d 909 (Ala.Civ.App. 1983). The statute does not mandate that there be substantial evidence. State Oil GasBoard v. Seaman Paper Co., 285 Ala. 725, 235 So.2d 860 (1970). We simply determine whether the evidence supports the Board's orders. Seaman, supra.
We cannot substitute our judgment, nor could the circuit court, substitute its judgment, for the Board's with regard to these findings of fact, and we consequently attach no presumption of correctness to the circuit court's ruling.Seaman, supra.
Although expert testimony was presented supporting a participation formula based entirely on pore volume, other experts testified that the heterogeneity of Hatter's Pond made a single factor formula unreliable. As a result, the Board heard evidence supporting the inclusion of a second factor. Alternative two-factor formulas were proposed, including several that added a productivity factor. Several experts testified that the inclusion of such a factor would result in a participation formula more protective of correlative rights. The Board accepted this position and adopted a participation formula which was based in part on productivity.
We note, however, that appellees object not to the addition of a productivity factor, but to the time frame from which the productivity factor was obtained. Appellees' experts espoused a much shorter and more recent time period as being the appropriate yardstick for measuring productivity. However, as expert testimony indicated that to select a shorter time frame would not take into account the varying conditions of the wells in Hatter's Pond, the Board opted for a more expansive time frame.
Evidence suggested that the wells would be at varying stages of physical deterioration within the more recent time frame. However, productivity as defined by the Board takes into account this factor by expanding the time frame from which a well's productive capability is determined. We opine that this decision was reasonable and reflected the Board's desire to eliminate from the formula any possibility of skewed production figures due to the age of a well, the corrosion within it, the salt buildup within it, as well as other time related factors.
The need for an accurate well production factor is obvious. An older well with salt buildup, corrosion, etc., might not produce at full capacity. As a result, it could inaccurately reflect an underlying tract's ability to produce. An expansive time frame, however, would put all the wells, regardless of age, on equal footing, because each well's best month of production would be used as the critical factor. Such an allocation factor would put each well in its best light and thus would be nondiscriminatory. Therefore, the Board reasonably concluded that a well's best month of production was a better indicator of the underlying tract's ability to produce in the future than was a month within the more limited time frame, making the Board's order concerning this *Page 255 
issue not without reasonable justification as required byHughes, supra.
We note that the productivity factor is not designed to reflect what a single well will contribute to future production but is to be an indicator of what the entire tract will contribute. In light of this fact, the Board was not unreasonable in attributing to each tract the best month in a well's history.
Further, as experts testified that a productivity factor would result in a fairer participation formula, the Board's decision to include such a factor is not unsupported by the evidence. We also note that the Board's alternatives with regard to defining productivity are not limited to those proposed by the participants in the hearings. § 9-17-7(f), Code 1975; see also, Rule 400-1-12-.23, supra. Consequently, it was within the province of the Board to define productivity in a manner not specifically proposed by the hearing participants. So long as the formula was reasonable and supported by the evidence, we may not substitute our judgment for that of the Board. Seaman, supra. We find that the formula meets these requirements.
Appellants also asserted as error the circuit court's directive that a revised participation formula be developed and applied retroactively. As we have upheld the Board's original formula, review of this issue is not required.
The Board determined that the SW/4 of Section 27, the S/2 of Section 28, T1S, R1W, and the SE/4 of Section 8, T2S, R1W should be included in the unit area. However, the circuit court asked the Board to reconsider on remand whether these three tracts should be included in the unit. We find this direction incongruous with the court's finding: "The Court does not find that the inclusion of these tracts in the unit is not supported by the evidence or is not reasonable. . . ."
We agree with the circuit court's determination that the Board's inclusion of these tracts is supported by the evidence and is reasonable. First, the record is replete with expert testimony that no portion of Hatter's Pond should be mapped as constituting a separate reservoir. This position was further supported by geological maps introduced at the hearings. The significance of such a determination is that all tracts that are a part of a single reservoir are necessarily in communication with the others. Although contradictory expert testimony suggested that these tracts were not in communication with the Hatter's Pond reservoir (suggesting the existence of separate reservoirs), the Board heard this evidence and resolved the controversy in favor of the experts supporting the single reservoir concept.
In addition, there was expert testimony that these tracts will contribute to unit production. Specifically, O'Dell, an expert for Getty, testified that hydrocarbons are located in Tracts 800, 2700, and 2800, and that these tracts will contribute to unit production. Other engineers supported his position.
As we cannot substitute our judgment for that of the Board's,Seaman, supra, and the decision to include the tracts is not unreasonable or unsupported by the evidence, we affirm the Board's inclusion of Tracts 800, 2700, and 2800 within the unit area.
We also note that appellee Anderson maintains that these three tracts, as well as two additional tracts, Section 11, T2S, R1W (Tract 1100) and Section 22, T2S, R1W (Tract 2200), should not be included because they are not developed and at the time of unitization had no producing wells on them. To support this contention, Anderson relies on section 9-17-12(d), Code 1975. Appellees' reliance on this section is misplaced as this particular Code section deals with allocation during primary production.
On the other hand, allocation during secondary recovery is governed by sections 9-17-80 through -88, Code 1975. This article of the Oil and Gas chapter deals with unit operations as compared to the article cited by appellee Anderson which deals with conservation and regulation of production. Pursuant to section 9-17-82, Code 1975, the Board is authorized to unitize "an *Page 256 
entire field . . . to prevent waste or to avoid the drilling of unnecessary wells." This section does not limit unitization to those areas of the field that have currently producing wells.
Finally with regard to the inclusion of Tracts 1100 and 2200, experts testified that both tracts were underlain with recoverable hydrocarbons. Simply because these tracts have no producing wells they are not excludable from the unit area. Pursuant to section 9-17-83(3), Code 1975, Tracts 1100 and 2200 must be allocated a portion of the revenues "based on the relative contribution which each such tract or interest is expected to make." The Board has complied with this mandate, and we affirm the tracts' inclusion.
Appellants further assert that the circuit court erred when it directed the Board on remand to afford "procedural due process as pertains to discovery" to the parties involved in the controversy. Appellees have interpreted this statement as reflecting a finding by the circuit court that appellees were indeed denied procedural due process. Appellants argue that this is not the case. They maintain that the court was simply issuing a directive to insure that on remand all parties would be afforded procedural due process with regard to discovery.
Accepting as true appellees' contention that the circuit court found appellees were denied procedural due process in the hearings before the Oil and Gas Board, we first review whether our oil and gas statutes afford participants a constitutional right to pretrial discovery in proceedings before an administrative agency.
We note that in the case of Dawson v. Cole, 485 So.2d 1164
(Ala.Civ.App. 1986), we stated: "It has been generally recognized that there is no basic constitutional right to prehearing discovery in administrative proceedings." Appellants assert that this statement forecloses any further inquiry into this issue. We disagree.
A closer reading of our opinion in Dawson, supra, discloses our acknowledgement that "the denial of prehearing discovery asapplied in a particular case" could result in a due process violation. Thus, we must examine whether the Board's denial of appellees' discovery request did in fact result in a denial of procedural due process.
We have examined the record and are satisfied that it did not. Throughout these proceedings, appellees have maintained that separate reservoirs exist in Hatter's Pond field. Appellees maintain that the information they requested but to which they were denied access would support their contention. However, numerous experts testified and maps were presented refuting this position.
Thus, even accepting as true appellees' argument that the information withheld by Getty would give credence to their position that the field consisted of separate mappable reservoirs, extensive testimony was given and numerous supporting documents were offered into evidence to support the Board's finding of a single reservoir. At most, therefore, the requested information would have been merely cumulative of that evidence supporting appellee's position that separate reservoirs existed in the field. The Board would still have been required to make a decision based on conflicting evidence. In other words, the required production of the information sought by appellees would not necessarily have changed the Board's decision. Consequently, we do not find a due process violation by the Board in this aspect of the case.
In its cross appeal Hatter's Alabama contends that because the value of full well stream gas in Section 17 is lower than the value of the gas produced by the other sections, the circuit court erred by not directing the Board to adjust its formula to reflect this difference. We have examined the record and find that the Board's original decision not to adjust the pore volume factor allocated to Section 17 is supported by the evidence.
Recognizing once again that the Board's orders are presumed valid, Roberts, supra, and that we cannot substitute our judgment for the Board's, Roberts, supra, we cannot say that the decision not to make an adjustment is either unsupported by the *Page 257 
evidence or unreasonable. Thus, we affirm its decision not to make an adjustment.
Expert testimony was presented that indicated that a well's liquid yield was not a good determinant of the underlying tract's contribution. For example, an expert for Getty testified that two wells had been drilled on one particular tract — only one hundred and ninety feet apart, and a sixteen percent difference in the condensate yield from the wells resulted.
Additional expert testimony showed that liquid yield was not a good indicator of contribution as condensate yield could be affected simply by the location of the well perforation. We hold this is sufficient evidence from which the Board could reasonably conclude that an adjustment to pore volume based on liquid yield would not result in a more accurate participation formula.
Finally, Anderson asserts in his cross appeal that the Board should be directed to make adjustments to the pore volume factor that comprises sixty percent of the formula. Anderson maintains that without an adjustment to pore volume based on the remaining recoverable reserves left in a tract, the participation formula will have no reasonable relation to each tract's expected contribution to future unitization. Anderson then advocates conducting bottom hole pressure tests for determining these remaining recoverable reserves. Anderson contends that it is "elementary" that the amount of pressure in a container is indicative of the amount of gas in it.
The Board, however, rejected this argument and found that conducting bottom hole pressure tests was both unnecessary and unwarranted. O'Dell, a Getty expert, testified that seven years of production and pressure in Hatter's Pond made additional bottom hole pressure tests useless. O'Dell, adopting a position advocated by Exxon, also testified that too much pressure variation existed for the tests to be reliable, and they would not prove the existence of separate reservoirs within the field. More importantly, the evidence indicated that this type of testing was of value only if Hatter's Pond consisted of more than one reservoir.
We have already pointed out that the Board determined Hatter's consisted of one reservoir and that such a determination was reasonable. An expert for appellees testified that the Board formula was appropriate if Hatters' were one reservoir. Thus, appellees' own expert supports the Board's refusal to make any adjustment to pore volume based on remaining recoverable reserves.
Based on the evidence and the guiding standard of review, we reverse the order of the circuit court and remand it for the entry of an order affirming the orders of the Oil and Gas Board.
REVERSED AND REMANDED WITH INSTRUCTIONS.
WRIGHT, P.J., and HOLMES, J., concur.